**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JORDAN JUST,

        Plaintiff,

    v.

PAUL DIGENNARO and
JEFFREY GOSS,

        Defendants.

No. 3:18-CV-01314

(Chief Judge Brann)

## MEMORANDUM OPINION

### DECEMBER 23, 2021

Though it has since been winnowed, this case began in March 2018 after Jordan Just sued various SCI-Benner corrections officers and officials alleging that he had been the victim of persistent antisemitic behavior and an excessive force incident.[1] With trial scheduled for January 10, 2022, I'll now consider the parties' motions in limine. But before delving into the legal standard and the merits of these motions, a bit of background is in order.

## I.    BACKGROUND

### A.    Just's Allegations of Persistent Antisemitic Behavior

Just entered the Pennsylvania prison system after pleading guilty to voluntary manslaughter a decade ago.[2] In his telling, his religious belief was apparent from the

---

[1]    *See generally* Doc. 1.
[2]    Doc. 40 ¶ 1; Doc. 64 at 1.

start: since high school, he has had the nickname "Jew" (which he doesn't find offensive) and, upon his arrival at SCI-Benner in 2013, he participated in prison Jewish life—attending services and holiday events.[3] Just alleges that antisemitic harassment soon followed:

- Corrections Officer DiGennaro would draw swastikas on his coffee cup, give "hail Hitler" salutes, call Just a "kike" when Just was completing work assignments for him, and say that he wanted to throw Just into the oven.[4]

- Corrections Officer Whipple would make similar oven jokes, as well as others about gas chambers and concentration camps.[5]

- Corrections Officer Englert would constantly refer to his desire to collect Just's tears so that he could sell "Jew tears" on the black market, would joke about Just's fear of the showers (in an allusion to the gas chambers), and was famous among other guards for a joke where he would ask how high the grass was in Germany and then raise his arm toward Just as if saluting to Hitler.[6]

- Corrections Officer Goss would also mention his desire to put Just in an oven and referred to Just's father as his "Jew attorney" and his "Jewish daddy attorney."[7]

---

[3]   Doc. 40 ¶¶ 2–11; Doc. 44 ¶¶ 2–11.
[4]   Doc. 40 ¶¶ 12, 14–17; Doc. 44 ¶¶ 12, 14–17.
[5]   Doc. 40 ¶ 13; Doc. 44 ¶ 13.
[6]   Doc. 40 ¶¶ 14–15; Doc. 44 ¶¶ 14–15.
[7]   Doc. 44 ¶ 19.

- And though it isn't clear who did it, Just has evidence showing that his door-tag was defaced, with his name being placed next to a picture of Hitler.[8]

Out of what Just describes as a desire to keep his head down and avoid the guards' (further) ire, he did not initially file grievances against the guards for their conduct.[9]

### B.    The Alleged Excessive Force Incident

As Just tells it, this antisemitic harassment came to a head on October 14, 2017, when he claims to have been the victim of an excessive force incident.[10] That day, Just alleges that he was waiting in the pill line when Goss and DiGennaro accused him of giving something to another inmate—in his deposition, Just alleged that another inmate had taken his ID card and then given it back.[11] Goss and DiGennaro then escorted him away from the pill line to search him.[12] The events that purportedly followed are at the heart of his case.

Just alleges that he was then escorted to a room to be searched; and, with just Goss in the room, he was attacked from behind after Goss reportedly saw him take something from his pocket and put it in his mouth in transit.[13] Shortly after, DiGennaro apparently entered the room and choked, handcuffed, and then slammed Just against the wall.[14] Just further alleges that during this altercation Goss and

---

[8]    Doc. 40 ¶¶ 21–26; Doc. 44 ¶¶ 21–26.
[9]    Doc. 40 ¶ 43; Doc. 44 ¶ 43.
[10]   Doc. 8 ¶¶ 32–40.
[11]   *Id.* ¶ 34.
[12]   *Id.* ¶ 35.
[13]   *Id.* ¶ 36.
[14]   *Id.* ¶ 37.

DiGennaro made antisemitic remarks, with DiGennaro threatening to take him into a prison cell and beat him if he didn't admit to swallowing a pill, while also remarking that this incident would prevent Just from being released on probation.[15]

According to Just, the incident aggravated an existing back injury (he was in the pill line to receive a prescription to treat nerve pain from a motorcycle accident, which had broken multiple bones in his back), and he also suffered knee pain, fractured teeth, and various psychological harms.[16] For their part, DiGennaro and Goss have disputed that Just's pill line activities were innocent. And they further argue that they did not use excessive force, pointing to a Just-signed statement admitting as much and to the fact that, after the incident, he reported no injuries to the medical staff.

In any event, Just was given a misconduct for the incident—at that point, his only misconduct in nearly nine years in prison. He disputed the four charges that made up the misconduct at a hearing and later appealed the two that he was found guilty of (refusing to obey an order and lying to an employee).[17] Ultimately, these appeals were denied. Just, however, has further alleged that this process was tainted—arguing that the appeals officer never watched the video of the incident and that he was not given the misconduct notice within 24 hours, as required.[18] What's

---

[15]  *Id.* ¶ 40.
[16]  Doc. 8 ¶ 43.
[17]  Doc. 40 ¶¶ 33–37.
[18]  Doc. 44 ¶ 30.

more, after this incident, he claims to have filed a grievance about the guards' antisemitic behavior, which was denied—though DiGennaro and Goss dispute this characterization.[19] And a few months later, in March 2018, Just sued.[20]

### C.   Procedural History

Just's suit was eventually referred out to Magistrate Judge Susan E. Schwab. In its amended form, his complaint included four counts:

- Count One contained Eighth and Fourteenth Amendment Excessive Force Claims against DiGennaro and Goss, as well as Pennsylvania Secretary of the Department of Corrections John Wetzel and SCI-Benner Prison Superintendent Tammy Ferguson.[21]

- Count Two contained First, Eighth, and Fourteenth Amendment claims tied to the antisemitic remarks made by corrections officers. It named Wetzel, Ferguson, DiGennaro, and Goss, as well as Corrections Officers Whipple, Englert, and Richie, and Prison Counselors Heckman and Burke.[22]

- Count Three contained First, Eighth, and Fourteenth Amendment claims against Wetzel and Ferguson for failing to protect Just.[23]

---

[19]   Doc. 40 ¶ 43; Doc. 44 ¶ 43.
[20]   *See generally* Doc. 1.
[21]   Doc. 8 ¶¶ 54–68.
[22]   *Id.* ¶¶ 69–81.
[23]   *Id.* ¶¶ 82–96.

- Count Four contained Fifth and Fourteenth Amendment claims against Wetzel and Ferguson based on supposed deficiencies of the misconduct proceeding.[24]

The Defendants moved for summary judgment on all but the excessive force counts against DiGennaro and Goss.[25] And this Court later adopted Magistrate Judge Schwab's recommendation to grant the Defendants' motion in full.[26] In doing so, I dismissed Just's constitutional claims based on the antisemitic remarks, as United States Court of Appeals for the Third Circuit and Supreme Court precedent make clear that no matter how vile, these comments do not rise to the level of a constitutional violation.[27] And I also dismissed his claim relating to the procedural deficiencies of the misconduct complaint, as Just did not contest the Defendants' motion.[28] Still, this summary judgment motion did not include Just's Eighth and Fourteenth Amendment claims against DiGennaro and Goss for excessive force, so they proceeded toward trial.

In line with the Third Circuit's pattern jury instructions, to succeed on these claims, Just will need to show that DiGennaro and Goss caused him physical harm by "us[ing] force against [him] maliciously, for the purpose of causing harm, rather than in a good faith effort to maintain or restore discipline."[29] And here,

---

24    *Id.* ¶¶ 97–109.
25    *See* Doc. 38.
26    *See* Doc. 50.
27    *See id.*
28    *See id.*
29    Model Civ. Jury Instr. 3rd Cir. 4.10 (2020) (Section 1983 – Excessive Force – Convicted Prisoner).

"maliciously" is defined as "intentionally injuring another, without cause or reason, and doing so with excessive cruelty or a delight in cruelty."[30]

Today's rulings on the parties' motions in limine outline the ways that the parties can make their respective cases.

## II.   LEGAL STANDARD

The purpose of a motion in limine is to aid the clear presentation of evidence at trial. "Evidence should only be excluded on a motion in limine if it is clearly inadmissible on all potential grounds. The movant bears the burden of demonstrating that the evidence is inadmissible on all potential grounds."[31] And regardless, "in limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[32]

## III.   ANALYSIS

### A.   Just's Motion in Limine

Just seeks to prevent DiGennaro and Goss from impeaching his testimony through his prior criminal convictions—a DUI in 2006, simple assault and harassment in 2010, and voluntary manslaughter in 2011.[33] DiGennaro and Gross do not plan to raise his 2006 and 2010 charges. But they contest Just's efforts to exclude the voluntary manslaughter conviction.[34]

---

[30]   *Id.*
[31]   *Hunt v. Drake*, 2020 WL 3402343, at *1 (M.D. Pa. June 19, 2020).
[32]   *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).
[33]   *See* Doc. 64.
[34]   Doc. 73 at 3.

Federal Rule of Evidence 609 governs the use of criminal convictions to impeach witnesses. Under the rule:

> (a) In General. The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> > (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
> >
> > > (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
> > >
> > > (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and
> >
> > (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement.
>
> (b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
> > (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
> >
> > (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.[35]

---

[35]   Fed. R. Evid. 609.

Because of three factors—Just was charged with a crime punishable by imprisonment for more than one year, he brought a civil claim, and he has not been released from confinement—his conviction falls under 609(a)(1)(A) and "must be admitted, subject to Rule 403 . . . ."[36] In assessing claims under Rule 403, courts apply a four-factor test to determine whether a criminal conviction's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."[37] Those factors are: "(1) the kind of crime involved, (2) when the conviction occurred, (3) the importance of the witness' testimony to the case, and (4) the importance of the credibility of the [witness]."[38]

To start, weighing the "kind of crime involved," requires that I assess "the impeachment value of the prior conviction . . . ."[39] Crimes that involve dishonesty have a high probative value; they suggest that the witness may lie. But "[c]rimes of violence generally have low probative value";[40] that's because these crimes merely suggest that the witness is violent—which, while a problem in general, tends not to be an issue when the person is testifying in court. Just's crime is manslaughter. It is not a crime of dishonesty; nor is there any indication that it was committed in a dishonest way. So because the inference that the jury would tend to draw from its inclusion is not that Just is a liar, but that he is violent (and, indeed, this trait would

---

[36]   *Id.*
[37]   Fed. R. Evid. 403.
[38]   *United States v. Greenidge*, 495 F.3d 85, 97 (3d Cir. 2007).
[39]   *United States v. Caldwell*, 760 F.3d 267, 286 (3d Cir. 2014).
[40]   *Id.*

unfairly muddy the water on his excessive force claim), this factor tilts heavily against inclusion.

Second, there is the recency of the conviction. Put simply, older convictions are less probative of a witness's credibility. Still, an older conviction's probative value can be preserved if the witness is still incarcerated.[41] Here, while Just's conviction is now a decade old, he remains in prison—which weighs in DiGennaro and Goss's favor.

Third, courts consider "the importance of the witness' testimony to his case . . . ."[42] This factor is uncontested. DiGennaro and Goss concede that Just's "testimony is important to his case . . . ."[43] So this factor weighs against admission.

"Finally, the fourth 'factor concerns the significance of the [witness's] credibility to the case."[44] If Just's "credibility is a central issue, this weighs in favor of admitting a prior conviction."[45] As DiGennaro and Goss highlight, Just's "credibility is squarely at issue in this case [because Just] alleges that Correctional Officers Goss and DiGennaro used excessive force . . . . [and n]o injuries were noted by the nurse or reported by [Just] when he was seen by medical following the alleged

---

[41] *Caldwell*, 760 F.3d at 287.
[42] *Moore v. Granlund*, 2020 WL 1285329, at *5 (M.D. Pa. Mar. 18, 2020).
[43] Doc. 73 at 6.
[44] *Moore*, 2020 WL 1285329, at *5
[45] *Caldwell*, 760 F.3d at 288.

incident."[46] So just as the third factor supported excluding the conviction because of the importance of his testimony, this fourth factor weighs equally against.

In total, the four factors favor exclusion. The third and fourth factors are a wash. And although Just is still imprisoned, his voluntary manslaughter conviction is not probative of his honesty. And at the same time, its inclusion risks "unfair prejudice, confusing the issues, [and] misleading the jury . . . ."[47]

Just's motion in limine to exclude his convictions is accordingly granted.

## B.      DiGennaro and Goss's Motions in Limine

DiGennaro and Goss also filed motions in limine. One of these motions seeks to exclude evidence relating to a prior  allegation of abuse against DiGennaro, which Just does not oppose.[48] But he does oppose DiGennaro and Goss's other motion, which seeks to exclude the testimony of his expert, James T. Garvey.[49]

Garvey is a former corrections officer, prison official, and corrections training instructor.[50] He has accrued over 30 years of experience in these capacities—including time spent as a three-star Chief at Rikers Island.[51] And this would not be the first prison case he has testified in; indeed, he has testified in federal courts in New York, Illinois, Puerto Rico, and Kansas.[52]

---

[46]    Doc. 73 at 4.
[47]    Fed. R. Evid. 403.
[48]    Doc. 70; Doc. 72.
[49]    Doc. 71.
[50]    *Id.* at 4.
[51]    *Id.*
[52]    *Id.*

In October 2019, before this Court's adoption of Magistrate Judge Schwab's report and recommendation (and, in fact, before her drafting of the report), Garvey produced a preliminary report. This report, which was based on the broader pre-summary judgment claims, included opinions on 11 topics:

1. COII Whipple observed the defaced cell card outside Jordan Just's cell that made him appear similar to Adolph Hitler and did nothing.

2. SCI Benner Security considered Jordan a person of interest in the drug smuggling operation in the facility and therefore targeted him for increased surveillance.

3. COI Goss and DiGen[n]aro were the only staff members to observe Jordan pass something to inmate Giesy while on the pill line. No one else reviewing the video mentions seeing this activity.

4. When COI Goss saw Jordan put his hand to his mouth, he immediately jumped on him without giving an order to stop.

5. At his misconduct hearing Jordan was found guilty of refusing the order to 'spit it out' but COI Goss testified he refused the order to 'open his mouth.' Yet neither order was given before force was used on Jordan.

6. COI DiGen[n]aro threatened a handcuffed Jordan with physical harm if he did not admit to swallowing something.

7. COIII Franks changed the sequence of events which made this incident appear to be a good use of force.

8. All parties who review the use of force video in the R&D never questioned what Jordan spit up in the trash pail or why COI Goss took a handcuffed Jordan back into the cell and out of camera range.

9. Although suspected of ingesting contraband, Jordan was not placed in a dry cell nor was his urine tested in a timely manner.

10. The circumstances of this incident and the investigation raise[] serious concerns about the culture of SCI Benner.

11. Jordan's opportunity for release on parole may have been negatively affected by the misconduct report.[53]

---

[53]   Doc. 68, Ex. A at 2 (reflecting the pagination of the exhibit).

Within this broad set of topics, Garvey expands on a host of issues—ranging from his opinion on the atypicality of the procedures the guards followed to whether the use of force was excessive.[54] Additionally, based on these opinions, Garvey concludes that Just was "subjected to discriminatory and anti-Semitic treatment" and that "[t]his discriminatory treatment culminated in an incident where [Just] was assaulted by an officer who was anxious to prove that [he] was involved in dealing drugs in the facility."[55]

DiGennaro and Goss object to this testimony on two grounds. First, they raise a *Daubert* challenge, arguing that Garvey fails to meet the requirements of Federal Rule of Evidence 702.[56] And second, they contend that even if his testimony does meet the Rule 702 standard, opinions relating to Just's antisemitic treatment should be excluded under Rule 403.

In assessing *Daubert* challenges under Rule 702, the Third Circuit directs district courts to weigh "a trilogy of restrictions on expert testimony: qualification, reliability, and fit."[57] The court explained the contours of these three factors as follows:

> Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective

---

[54]   *Id.* at 2–10.
[55]   *Id.* at 11.
[56]   *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).
[57]   *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[58]

When the expert at issue does not use a scientific method, courts' assessments—though still centered on the three factors—have necessarily shifted.[59] When evaluating reliability in these circumstances, courts must "'focus upon [the] personal knowledge and experience' of the witness [because] the methodology used will be applying that experience to the facts of the case."[60] While in weighing fit, "a non-scientific expert 'must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative.'"[61]

DiGennaro and Goss challenge Garvey's qualifications at each stage. But because these three factors run together—Garvey's qualification, his prison

---

[58] *Id.* (internal citations omitted).

[59] Far from an ad-lib, this response comes from the Federal Rules Advisory Committee Notes. Fed. R. Evid. 702 advisory committee's note to 2000 Amendment. ("For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.").

[60] *Jackson v. City of Pittsburgh, Pa.*, 2010 WL 3222137, at *9 (W.D. Pa. Aug. 13, 2010) (quoting *Roberson v. City of Philadelphia*, 2001 WL 210294, at *5, n.10 (E.D. Pa. Mar. 1, 2001) (internal alterations omitted).

[61] *Id.* (quoting *Roberson*, 2001 WL 210294, at *5, n.10).

experience, dictates the extent to which he can provide reliable, non-speculative testimony—I'll consider them together. Indeed, the confluence of these factors is reflected in the Guards' challenge: at its core, their argument is that Garvey's prison experience does not extend to opinions on Just's antisemitic treatment. But they don't stop there. They also test the waters on two more extensive theories. First, they insinuate that any testimony relating to Just's antisemitic treatment is not relevant. And second, they imply that Garvey's testimony on the excessive force incident itself should not be permitted.

So what then are the appropriate bounds of Garvey's testimony?

At the outset, I'll note that Garvey's testimony has a role—contrary to DiGennaro and Goss's contention that "[i]n this case, nothing Mr. Garvey purports to offer is the proper subject of expert testimony."[62] But his expert report, which previews the potential extent of his testimony, has its issues.

At least three important restrictions on expert testimony are implicated here. For one, while Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the advisory committee notes make clear that this allowance does not give experts leave to "merely tell the jury what result to reach."[63] As a result, experts still cannot reach an ultimate *legal*

---

[62]   Doc. 68 at 7.
[63]   Fed. R. Evid. 704; Fed. R. Evid. 704 notes of advisory committee on proposed rules.

issue.[64] Second, "intent is not a proper subject for expert testimony. . . . '[it] is a classic jury question and not one for the experts.'"[65] And even if it were not, there would be "serious problems with the reliability of these opinions" that would otherwise lead to their exclusion.[66] And third, while Garvey can state that he relied on Just's telling of the events in his deposition and testimony, he cannot merely regurgitate Just's story as if he witnessed it. He is an expert witness, not a lay witness, so this testimony would not "help the trier of fact to understand the evidence or to determine a fact in issue."[67]

By this standard, impermissible testimony does not merely pockmark the report; it pervades it.

Still, this Court is loath to use a shredder when a scalpel will do.[68] At various points, Garvey's expert report highlights areas where his testimony, based on his three decades of experience, would aid the jury.

---

[64]    *See Jackson*, 2010 WL 3222137, at *9 ("[A] properly qualified non-scientific expert may not offer an opinion as to an ultimate legal issue because to permit this type of evidence would subvert the jury's function to decide the disputed facts and issues after being properly instructed as to the law by the court.").

[65]    *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) (quoting *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000)).

[66]    *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 876900, at *9.

[67]    Fed. R. Evid. 702; *see* Fed. R. Evid. 703. *See also Jackson*, WL 3222137, at *9 ("[N]on-scientific expert witnesses are not permitted to express opinions as to the credibility or of the facts generally.").

[68]    The report is not a straitjacket: "The purpose of the [expert] report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrack)*, 619 F.3d 729, 734 (7th Cir. 2010).

Garvey can speak to the role of drug-related random cell searches and factors that guards consider in their use; he can speak to prison surveillance practices and how guards tend to react when that surveillance does not bear fruit; he can speak to what he noticed about the pill line video; he can speak to the best practices for escorting an inmate; he can speak to how a guard is taught to respond when an inmate is suspected of swallowing drugs and the best practices for determining whether they have done so; and he can speak to how guards are generally taught to use force and later document their use of force.[69] These opinions are relevant, within the scope of his expertise, and do not invade the prerogative of the jury. And if DiGennaro and Goss find his testimony on these topics wanting, they can bring out these deficiencies on cross-examination.[70]

But at the same time, Garvey cannot opine reliably on much of his report's excessive-force-related content. Because of the prohibition on expert testimony that speculates about a person's state of mind, he cannot conclude that Just was pulled from the pill line in bad faith. Neither can he conclude that the alleged force incident occurred just as Just stated that it did in his deposition. (Now, he can state that he

---

[69]   *See* Doc. 68, Ex. A at 2–10.

[70]   *Simon v. Weissmann,* 301 F. App'x 107, 116 (3d Cir.2008) (quoting *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002)) ("A 'party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.'"); *see also Stokes*, 2018 WL 3361456, at *5 (quoting *Daubert*, 509 U.S. at 596) ("The adversarial system ensures that, through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," expert testimony may be shown wanting.").

relied on Just's testimony in assessing whether the conduct conformed with what he believes to be the appropriate method, but the mere repetition of Just's testimony will not assist the trier of fact.) Nor can Garvey embrace the ultimate legal issue here, that the guards used excessive force—that would invade the prerogative of the jury. And finally, he cannot conclude that Just's misconduct impacted his parole chances, as his expertise does not extend that far.

So having established that Garvey can indeed testify—albeit on a more limited array of issues than his preliminary report touches on—I'll now turn to the challenges that DiGennaro and Goss have raised about testimony relating to Just's antisemitic treatment. On this front, they bring challenges both big and small.

They first make a more limited challenge to Garvey's ability to opine on these discriminatory incidents.[71] And though they haven't filed a separate motion in limine on the subject, their briefing also casts doubt on whether these topics can be broached at all.

For one, DiGennaro and Goss argue that because Just's constitutional claims based on this antisemitic conduct were dismissed, Garvey's testimony on the topic would no longer be relevant.[72] (And there's no reason to think that the topic's relevance would change if the testimony comes from Just's, rather than Garvey's, mouth.) Likewise, they contend that Garvey's testimony on the topic should be

---

[71]   Doc. 68 at 5–9.
[72]   Doc. 68 at 5–6; Doc. 74 at 3.

excluded under Rule 403 because Just's antisemitic treatment does not relate to the excessive force incident and would risk unfair prejudice.[73] (And that argument too would extend to all speakers.) These are broad challenges.

I'll start with DiGennaro and Goss's attempt to exclude any testimony about Just's antisemitic treatment. In short, this effort fails. That this Court dismissed Just's constitutional claims based on these comments does not automatically render them irrelevant. It is definitively not the case that every bit of evidence admitted in a case must support an independent claim; the bar is much lower.[74]

Federal Rule of Evidence 401 provides that "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[75] And as the advisory committee notes to the rule state, "[t]he fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action."[76] To succeed in his claim, as highlighted above, Just must show that DiGennaro and Goss caused him physical harm and, that in doing so, they "used force against [him] maliciously, for the purpose of causing harm, rather than in a good faith effort to maintain or restore discipline."[77] Just's theory is

---

[73]  Doc. 68 at 8–9.
[74]  *See* Fed. R. Evid. 401.
[75]  *Id.*
[76]  Fed. R. Evid. 401 notes of advisory committee on proposed rules.
[77]  Model Civ. Jury Instr. 3rd Cir. 4.10 (2020) (Section 1983 – Excessive Force – Convicted Prisoner).

that the guards used excessive force, not for a bona fide reason, but because they hated him for his Jewish faith. And evidence showing the guards' callous, prejudiced behavior is both of consequence and makes this theory more probable.

DiGennaro and Goss's argument that Just's antisemitic treatment, writ-large, should be excluded under Rule 403 similarly fails. This rule requires that evidence be excluded when its probative value is substantially outweighed by, among other things, the risk of unfair prejudice or confusing the issues for the jury.[78] In claiming that this evidence's probative value is low, DiGennaro and Goss reiterate the argument that I just rejected above—that because the antisemitic comments could not support a constitutional claim, they are now irrelevant.[79] On the other side of the ledger, DiGennaro and Goss contend that admitting testimony on this topic would be inflammatory and confuse the issues.[80] I disagree that the probative value of *any* evidence of Just's antisemitic treatment is substantially outweighed by the danger of unfair prejudice or confusing the issues.

But while I disagree with DiGennaro and Goss's broad assertion, I agree on two narrower grounds. For one, only DiGennaro and Goss's antisemitic comments remain relevant. Evidence of their religious animus makes it more probable that malice motivated their use of force. But the same cannot be said of the other guards'

---

[78]   *See* Fed. R. Evid. 403.
[79]   Doc. 68 at 8.
[80]   *Id.* at 8–9.

conduct. They weren't involved in the pill line altercation. So testimony on their conduct flunks Rule 401 and 403 and will not be admitted.

Second, I agree with DiGennaro and Goss that Garvey has no business testifying on Just's antisemitic treatment: Garvey cannot reliably opine on the guards' motives; and while the failures attributed to the facility on this front are certainly disturbing, they are not relevant to Just's remaining claim. This prohibition includes testimony that—in line with his preliminary report—more or less regurgitates Just's telling of the events. And it also extends to Garvey's prognostications about how the prison failed to supervise and train its staff to ensure that inmates are treated with dignity, regardless of their religious affiliation.

*   *   *

In sum, DiGennaro and Goss's motion in limine is granted in part. I will permit Garvey to testify. But to the extent that DiGennaro and Goss's motion seeks to prevent Garvey from testifying about Just's antisemitic treatment, it is granted. And as I have identified, Garvey's expert report, as currently constituted and likely as edited, will not pass muster.

Still, that Garvey is precluded from testifying about Just's treatment does not mean that Just or another individual with personal knowledge of these events cannot. As I have noted, however, DiGennaro and Goss must be the perpetrators.

## IV.   CONCLUSION

For the reasons stated, Just's motion to exclude evidence of his prior criminal conviction is granted. Likewise, DiGennaro and Goss's motion to exclude evidence of a prior allegation of misconduct against DiGennaro is granted in full, while their motion to exclude James Garvey's expert testimony is granted only in part.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge